**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHERYL L. GANNON, | ) | CASE NO. 1:17CV02397 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| | ) | |

Plaintiff, Cheryl L. Gannon ("Plaintiff" or "Gannon"), challenges the final decision of

Defendant, the Commissioner of Social Security ("Commissioner"), denying her application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§

416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g)

and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth

below, the Commissioner's final decision is VACATED and the case REMANDED for further

consideration consistent with this decision.

# I.   PROCEDURAL HISTORY

In November 2013, Gannon filed an application for SSI alleging a disability onset date of September 14, 2013 and claiming she was disabled due to a traumatic brain injury.  (Transcript ("Tr.") 153, 186.).  The application was denied and Gannon requested a hearing before an administrative law judge ("ALJ").  (Tr. 92, 102.)

On April 12, 2016, an ALJ held a hearing, during which Gannon, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 35-74.)  On June 16, 2016, the ALJ issued a written decision finding Gannon was not disabled from September 14, 2013, her alleged onset date of disability, through November 3, 2015.  The ALJ did find Gannon disabled beginning November 4, 2015.  (Tr. 11-26.)  The ALJ's decision became final on September 25, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On November 15, 2017, Gannon filed his/her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case. (Doc. Nos. 15, 16.)  Gannon asserts the following assignments of error:

> (1)     The ALJ erred when he failed to provide "good/specific/supported"
> reasons for discounting the consistent opinions of Plaintiff's treating
> providers.

> (2)     The ALJ erred as a matter of law when he disregarded the import of
> Plaintiff's need for in-home health services.

(Doc. No. 15.)

# II.   EVIDENCE

## A.     Personal and Vocational Evidence

Gannon was born in November 1960 and was fifty two years-old at the time of her alleged onset date, making her a "person closely approaching advanced age" under social

security regulations. (Tr. 75.) In November 2015, she turned fifty-five, making her a "person of advanced age." (Tr. 24.) *See* 20 C.F.R. §416.963(d), (e). She has a limited education and is able to communicate in English. (Tr. 24.) She has past relevant work as a home health aide. (*Id*.)

**B.     Medical Evidence[1]**

**1.      Mental/Cognitive/Neurological Impairments**

On September 14, 2013, Gannon sustained significant head injuries in a golf cart accident. (Tr. 349.) She was life-flighted to a hospital after losing consciousness. (*Id*.) Diagnostic imagining of the brain revealed an acute subdural hematoma, evidence of a subarachnoid bleed, and a multiplanar skull fracture. (*Id*.) Gannon was admitted to the intensive care unit for several weeks and underwent multiple evaluations. (*Id*.) Head CT scans indicated her brain contusions and edema were progressing, but did not require surgery. (*Id*.) Gannon also underwent a psychiatric consultation, where she presented with a flat affect, minimal eye contact, and a delayed response to questioning. (Tr. 275.) Her toxicology screen was positive for cocaine and alcohol. (*Id*.) During a neurobehavioral examination, she had limited eye contact and occasional inattention. (Tr. 343.) She knew she was involved in a golf cart accident, but was unaware what city or hospital she was currently in. (*Id*.) Montreal Cognitive

---

[1]     The Court notes the recitation of the medical evidence is limited to the evidence cited in the parties' Briefs. The Court further notes the Commissioner has cited generally to large swaths of evidence in her Brief, at times totaling over 100 pages. (*See* Doc. No. 16 at 3, 5.) This does not comply with the Court's Order, which specifically provides the brief "shall cite, by exact and specific transcript number, the pages relating" to the facts at issue. (Doc. No. 5 at 3.) Thus, the Court will only discuss evidence which has been cited by the parties with specificity, as required by this Court's Order.

Assessment ("MOCA") testing yielded a score of 20/30, demonstrating impairment. (Tr. 344.) Hospital physicians recommended Gannon be discharged to a skilled nursing facility or rehabilitation facility, or have 24-hour supervision in the home. (Tr. 349.) Gannon was eventually discharged to her home on October 4, 2013, at her son's request. (*Id.*)

On November 25, 2013, Gannon initially visited neurologist Bruce Cotugno, M.D. (Tr. 413.) She had no recollection of her hospitalization and complained of persistent headaches, memory loss, behavioral changes, anger, and a loss of taste and smell. (*Id.*) On examination, Gannon's speech was pressured and her recall was absent. (Tr. 414.) She had normal sensation, normal upper extremity strength, but slightly decreased lower extremity strength. (*Id.*) She had a slow, ataxic gait. (*Id.*) Dr. Cotugno ordered a brain CT scan and an EEG. (*Id.*)

A December 16, 2013 brain CT scan revealed "extensive low density areas," which was "compatible with encephalomalacia and/or posttraumatic contusions." (Tr. 417.) There was no evidence of an acute hemorrhage. (*Id.*) Gannon's EEG was abnormal, but did not provide evidence of focal seizures. (Tr. 478.)

Gannon visited neurosurgeon Michael Oh, M.D., on January 13, 2014. (Tr. 425.) She reported dizziness, poor balance, loss of taste and smell, memory loss, and headaches. (*Id.*) On examination, Gannon seemed "frustrated . . . and somewhat disheveled." (*Id.*) She had no clear focal weakness on examination, but displayed "disorders of coordination and troubled finger-to-nose." (Tr. 426.) Dr. Oh reviewed her recent CT scan and advised her she did not require surgery. (*Id.*) Dr. Oh also discussed Gannon's care with her patient advocate, Dee Linsenski. (Tr. 424.) He recommended Gannon undergo neuropsych testing, see an ENT, and obtain a blended case manager. (*Id.*)

On January 14, 2014, Gannon followed up with Dr. Cotugno, who prescribed Lamictal and Trazadone. (Tr. 472, 473.) Gannon visited her primary care doctor, Shweta Arora, M.D., on January 16, 2014, reporting memory issues and dizziness. (Tr. 564.) Her physical examination was normal and Dr. Arora referred her for a mammogram. (Tr. 566, 568.) She saw Dr. Arora again on February 4, 2014, and her physical examination was again normal. (Tr. 446.)

On February 14, 2014, Gannon reported to Dr. Cotugno she had not had any seizures on Lamictal. (Tr. 469.) On examination, Gannon's gait was stable and her motor strength was normal. (Tr. 470.) Dr. Cotugno advised her she possibly had benign positional vertigo and provided her with some exercises to improve this condition. (*Id*.) Gannon returned to Dr. Cotugno on March 4, 2014 for buzzing in her left ear and headaches. (Tr. 713.) Dr. Cotugno adjusted Gannon's headache medications. (Tr. 714.)

On April 1, 2014, Gannon underwent a psycho-social assessment with psychologist Amelia Gremelspacher, Ph.D. (Tr. 525.) She reported poor short-term memory, agitation, and a personality change since her accident. (*Id*.) On examination, Gannon was somewhat unkempt, complaining loudly in the waiting room, sighing excessively during testing, and displaying tangential thought content. (Tr. 527.) She received a score of 26/30 on the mini-mental status examination ("MMSE"), indicating a "minor disruption." (*Id*.) Dr. Gremelspacher diagnosed

Gannon with bipolar disorder and assessed a Global Assessment of Functioning[2] ("GAF") score of 60. (Tr. 528.)

Gannon returned to Dr. Cotugno on April 23, 2014, reporting no seizures on her medications and a return of her sense of taste and smell. (Tr. 549.) She complained of dizziness, headaches, and hot flashes. (*Id.*) On examination, her gait was stable and her upper extremity strength was normal. (Tr. 550.) Dr. Cotugno adjusted Gannon's medications and prescribed Paxil. (*Id.*) Gannon saw Dr. Cotugno again on May 19, 2014, reporting poor sleep and throbbing headaches. (Tr. 593.) Dr. Cotugno prescribed Ambian and Cymbalta. (Tr. 594.)

On April 28, 2014, Gannon had her first visit with psychiatrist Oscar Urrea, M.D. (Tr. 687.) She was anxious on examination, but had normal memory, judgment, and perception. (*Id.*) Gannon reported "too many problems since the accident" and Dr. Urrea noted she "clearly has a cognitive impairment." (*Id.*)

Gannon returned to Dr. Gremelspacher on June 12, 2014, reporting Dr. Urrea had "annoyed" her because "he kept asking her a number of questions that she was unable to answer." (Tr. 690.) Dr. Gremelspacher noted Gannon was "unable to really get the idea that she had asked for an evaluation and [Dr. Urrea's] questions were an attempt to do so." (*Id.*) She again sighed excessively during testing and received a score of 16/30 on an MMSE, indicating

---

[2]    The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

deficits across all areas. (*Id.*) Dr. Gremelspacher observed Gannon was tearful over these results. (*Id.*)

Gannon saw Dr. Gremelspacher again on July 15, 2014, reporting she had a case manager who was assisting her with paperwork. (Tr. 688.) Dr. Gremelspacher noted Gannon "seems oriented but repeats same story as last visit" and her "discourse gets very tangential and she can get upset when speaking of a sad memory." (*Id.*)

On July 18, 2014, Gannon visited the UPMS Sports Concussion Center for an evaluation with Shailen Woods, M.D. (Tr. 658.) Gannon reported dizziness, headaches, mood changes, and poor sleep. (*Id.*) Dr. Woods referred Gannon to a neuropsychologist and to vestibular rehabilitation. (Tr. 659.) That same date, Gannon visited the emergency room after jamming her foot into a couch. (Tr. 1348.) The emergency room physicians "buddy taped" her toes and provided her with a post-operative shoe. (Tr. 1351.)

Gannon followed up with Dr. Cotugno on July 22, 2014, reporting her headaches were responding to medication. (Tr. 704.) Dr. Cotugno prescribed Ambian and Topamax. (Tr. 705.) Gannon then saw Dr. Urrea on July 28, 2014, and received a score of 12/30 on an MMSE, again displaying deficits across all areas. (Tr. 686.) Dr. Urrea concluded Gannon had a major cognitive impairment due to trauma. (*Id.*)

On August 12, 2014, Gannon had a treatment plan review with Dr. Gremelspacher. (Tr. 1091.) She underwent another MMSE, and scored a 12/20. (*Id.*) Dr. Gremelspacher noted Gannon "was found to have significant cognitive impairment due to trauma" and recommended Gannon receive supportive therapy. (*Id.*)

On September 10, 2014, Gannon visited the emergency room after tripping and falling onto her right elbow. (Tr. 1339.) X-rays revealed a fracture in her right orbital bone and a nondisplaced fracture in her right elbow. (Tr. 1342, 1345.) A CT scan of her brain indicated progressing focal atrophy or posttraumatic encophalmalacia and mild demyelinating changes involving the periventricular white matter. (Tr. 1344.) She required hospitalization for four days. (Tr. 987, 684.)

Gannon returned to Dr. Gremelspacher on September 25, 2014, reporting she may have passed out when she fell and broke her elbow. (Tr. 684.) She also reported she had a close friend who was monitoring her daily. (*Id*.) Dr. Gremelspacher noted while Gannon was able to describe her accident, it was with "lots of tangents" and "hysteric." (*Id*.) Gannnon also revealed she had appointed a guardian and had continued headaches, dizziness, and episodes of crying. (*Id*.)

On September 29, 2014, Dr. Urrea filled out a "Mental Residual Function Capacity Statement" prepared by Gannon's attorney. (Tr. 697-700.) He listed her diagnosis as "dementia, organic in origin" and her prognosis as "continued deterioration." (Tr. 697.) With respect to Gannon's particular limitations, Dr. Urrea found the following:

- She would be precluded for 15% or more of an 8-hour workday in her abilities to:

    - remember locations and work-like procedures;
    - understand and remember detailed instructions;
    - carry out detailed instructions;
    - make simple work-related decisions;
    - complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods;
    - be aware of normal hazards and take appropriate precautions;

- use public transportation; and
- set goals and make plans independently of others.

- She would be precluded for 10% of an 8-hour workday in her abilities to:

  - understand and remember very short and simple instructions;
  - carry out very short and simple instructions;
  - maintain attention and concentration for extended periods of time;
  - perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
  - work in coordination with or in proximity to others without being distracted by them;
  - interact appropriately with the general public; and
  - respond appropriately to changes in the work setting.

- She would be precluded for 5% of an 8-hour workday in her abilities to:

  - sustain an ordinary routine without special supervision;
  - ask simple questions and request assistance;
  - accept instructions and respond appropriately to criticism from supervisors;
  - get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and
  - maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness.

(Tr. 698-699.) Dr. Urrea characterized Gannon as "severely impaired" and concluded she would not be able to work in a competitive work setting on a full-time basis for at least six months or be able to manage benefit payments. (Tr. 700.)

On October 2, 2014, Gannon visited Dr. Cotugno, reporting dizziness, impaired sleep, and poor memory. (Tr. 701.) Dr. Cotugno prescribed Lamictal, Cymbalta, Ambian, and Anaprox. (Tr. 702.)

Gannon saw Dr. Gremelspacher on October 21, 2014, reporting she had a home healthcare nurse and was in the process of obtaining a hospital bed and an aide to assist her with

housework.  (Tr. 1087.)  Dr. Gremelspacher noted Gannon presented in "a disorganized fashion," was "very dramatic," and "almost hysteric."  (*Id*.)

On November 24, 2014, Gannon visited Dr. Urrea, reporting she was doing well.  (Tr. 1086.)  She complained of depressive symptoms, but denied suicidal ideation.  (*Id*.)  On examination, she had a constricted affect, but normal concentration, memory, insight, and judgment.  (*Id*.)

On December 1, 2014, Gannon reported her September fall to Dr. Cotugno.  (Tr. 903.)  She indicated she had been waking up with numbness in both arms.  (*Id*.)  On examination, her upper extremity strength was normal.  (Tr. 904.)  Dr. Cotugno referred Gannon for vestibular therapy, ordered an EMG for both arms, and increased Gannon's Cymbalta dosage.  (Tr. 905.)

Gannon had treatment plan review with Dr. Gremelspacher on December 12, 2014.  (Tr. 1082.)  Dr. Gremelspacher noted Gannon's most recent MMSE score was a 12/20 and had "attended supportive therapy but is unable to remember goals."  (*Id*.)  Dr. Gremelspacher observed Gannon was receiving "extensive home support" and was "unable to communicate without preservation and tangents."  (*Id*.)

On December 17, 2014, Kelly Smith, a service coordinator at the Pennsylvania Department of Public Welfare, determined Gannon required a personal assistant services worker "with her in the morning and throughout the day as well as the evening to ensure she is eating and taking her medications as prescribed."  (Tr. 1172.)  Ms. Smith also noted Gannon "is a fall risk and needs to be monitored during the time she is taking a shower" and when Gannon was out in public "it is important to monitor [her] in the event a seizure erupts due to stimuli."  (*Id*.)

On January 8, 2015, Gannon reported to Dr. Gremelspacher she had been seeing a psychoneurologist, but had missed several appointments over the holidays and was "fired." (Tr. 1080.) She also indicated she had been approved for in-home services and an electric lift chair. (*Id*.) She explained she would receive 42 hours of assistance a week, non medical transport services, and an emergency button. (*Id.*) Dr. Gremelspacher noted despite the approval of these services, Gannon was "very pessimistic and reluctant to be happy about any relief she is going to receive." (*Id*.) One examination, Gannon displayed poor insight and a blunted tone. (*Id.*)

Gannon saw Dr. Cotugno on January 12, 2015, reporting poor sleep and numbness in her arms. (Tr. 900.) On examination, she had normal upper extremity strength. (Tr. 901.) Dr. Cotugno reduced Gannon's Lamictal dosage and prescribed Lyrica. (*Id.*)

On January 26, 2015, Gannon presented to the emergency room with shortness of breath and chest pain. (Tr. 1333.) She reported a possible loss of consciousness several days prior as well. (*Id*.) The emergency room doctors determined Gannon had a rib fracture. (Tr. 977.) Dr. Arora ordered an updated x-ray of her ribs on January 29, 2015. (Tr. 980.)

On February 3, 2015, Gannon initially saw nurse practitioner Kristen Graziano, DNP, CRNP, for a psychiatric evaluation. (Tr. 924.) She could not recall the details of her golf cart accident, but reported she had been struggling with dizziness, balance issues, repeated falls resulting in broken bones, "black outs," daily headaches, back pain, mood swings, forgetfulness, and poor short term memory since the accident. (*Id*.) On evaluation, Gannon was restless and went "off on tangents frequently." (Tr. 925.) She required frequent redirection and her speech was slightly rapid. (*Id*.) She had normal eye contact with no psychotic symptoms. (*Id*.) Her thought processes and thought contents were tangential and she displayed poor short and long

term memory.  (*Id.*)  Ms. Graziano observed Gannon's intellect was average and her insight and judgment were fair.  (*Id*.)  She diagnosed organic mood disorder, moderate major depression, cognitive disorder, intracranial hemorrhage, and post-concussion syndrome.  (*Id.*)  She prescribed Melatonin and Cymbalta.  (*Id*.)

Gannon visited Dr. Gremelspacher on February 5, 2015, reporting she was unsure if she tripped or had passed out when she had broken her rib.  (Tr. 1078.)  Dr. Gremelspacher noted Gannon was fidgety, displayed inappropriate laughter, and attempted "to play peek a boo" when she arrived for her appointment.  (*Id*.)

On February 24, 2015, Gannon visited Ms. Graziano, reporting poor sleep but improved anxiety.  (Tr. 919.)  Gannon then saw Dr. Urrea on February 27, 2015, indicating she was very depressed and could not sleep.  (Tr. 1077.)  She reported her Cymbalta was ineffective and Dr. Urrea advised her he would address her dosage with her neuropsychiatrist.  (*Id*.)

Gannon returned to Ms. Graziano on April 21, 2015, reporting a stable mood and no suicidal ideation.  (Tr. 919.)  On examination, she exhibited a fair mood with normal eye contact, but was somewhat restless with a tangential thought process.  (Tr. 920.)  She continued to display poor short and long term memory.  (*Id*.)

On April 22, 2015, Gannon visited Dr. Cotugno, reporting headaches three times a week. (Tr. 892.)  Her motor examination was normal.  (Tr. 893.)  Dr. Cotugno determined Gannon was a good candidate for Botox headache therapy.  (Tr. 894.)

On May 19, 2015, Ms. Granziano noted Gannon's mood had improved on Cymbalta and her Melatonin improved her sleep.  (Tr. 916.)  She observed Gannon was "in better spirits" and calmer.  (Tr. 917.)  Gannon's thought processes and thought contents were normal.  (*Id*.)

Gannon saw Dr. Cotugno again on May 22, 2015, and indicated last seizure occurred in November 2014. (Tr. 889.) On examination, she had a normal gait and normal upper extremity strength. (Tr. 890.) Dr. Cotugno observed Gannon had failed multiple headache medications and again recommended Botox therapy. (Tr. 891.) Gannon subsequently underwent a round of Botox injections and reported excellent improvement. (Tr. 885.)

On May 29, 2015, Gannon visited Dr. Urrea and reported impaired sleep, depression, and anxiety. (Tr. 1076.) Her memory, concentration, insight, and judgment were all normal on examination, but her affect was blunted and her mood dysphoric. (*Id.*) Dr. Urrea prescribed Remeron. (*Id.*)

Gannon returned to Ms. Graziano on July 18, 2015, reporting a stable mood. (Tr. 914.) She indicated her home health care services were going well. (*Id.*) She described intermittent anxiety, but improving coping skills and sleep. (*Id.*) Gannon's memory was intact and her judgment and insight were appropriate. (Tr. 915.)

Gannon followed up with Dr. Urrea on July 24, 2015, indicating no improvement on Remeron. (Tr. 1073.) She described several external stressors and reported her Cymbalta was providing some benefit. (*Id.*) Gannon saw Ms. Graziano on September 18, 2015, reporting a stable mood and fair sleep. (Tr. 912.) Her eye contact, thought processes, and thought contents were all normal. (*Id.*) Her memory was intact. (*Id.*)

On September 28, 2015, the Pennsylvania Department of Public Welfare authorized Gannon to receive personal assistant services for 42 hours a week. (Tr. 1150.) Her diagnosis on the authorization was listed as head trauma and she was noted to be "a severe fall risk" with "high levels of anxiety" and "extreme[ly] nervous." (*Id.*) The authorization form noted Gannon

would need assistance with, among other things, bathing, hair care, dressing, meal preparation, eating, laundry, light housekeeping, shopping, medication management, reading, managing finances, securing transportation, appointment scheduling, and supervised walks. (Tr. 1151.)

The following day, on September 29, 2015, the EMS brought Gannon into the emergency room, after being found outside in the rain. (Tr. 1304.) She reported she had gotten into an argument with her boyfriend over her substance use and went outside and sat in the rain. (*Id.*) Her toxicology was positive for cocaine and alcohol. (Tr. 1306.) A head CT scan revealed post-traumatic encephalomalacic changes in the front lobes, remote skull fractures, but no acute intracranial hemorrhage. (Tr. 1300.) The emergency room staff provided her with IV fluids. (Tr. 1371.) Once sober, she was confused, but no longer combative. (*Id.*) The Pennsylvania Department of Public Welfare subsequently increased her authorized personal assistance services to 57 hours a week on October 9, 2015. (Tr. 1148.)

Gannon presented to Dr. Gremelspacher on October 20, 2015, as agitated, reporting she was waiting to receive a special chair for her dizzy spells and back pain. (Tr. 1074.) Dr. Gremelspacher noted Gannon had an aid who was assisting her at home, as well as a case manager. (*Id.*)

On November 6, 2015, Gannon visited Ms. Graziano, reporting she was "doing fairly well," but had occasional anxiety. (Tr. 907.) Gannon saw Dr. Urrea a few days later, on November 13, 2015, reporting continued headaches and poor short term memory. (Tr. 1072.) Dr. Urrea noted while Gannon was stable on her medications, she had poor sleep. (*Id.*)

Gannon returned to Dr. Cotugno on November 20, 2015 for another round of Botox injections. (Tr. 880, 881.) She reported she was again having more than 15 headaches each

month.  (Tr. 880.)  Dr. Cotugno administered the Botox injections, noting Gannon had "excellent improvement" with the injections.  (Tr. 881, 882.)

On December 13, 2015, the Pennsylvania Department of Public Welfare again increased Gannon's authorized hours of home care, as she "had a [traumatic brain injury] and her current behavior changes have increased."  (Tr. 1165.)  Her behaviors were noted to "range from aggression, memory loss, anxiety, agitation, and depression," especially when she combined alcohol with her medications.  (*Id.*)  The Department staff noted Gannon required "a great deal of support at this present time."  (*Id.*)

Gannon visited Dr. Gremelspacher on December 15, 2015, reporting she had taken food to several shut-ins and she and her caregiver had decorated her home.  (Tr. 1070.)  Gannon also revealed she was currently facing eviction, as other tenants had called the police on her for stamping on the floor.  (*Id.*)  Dr. Gremelspacher observed Gannon was "somewhat manic on the subject of her eviction," but found her behavior understandable.  (*Id.*)

On January 14, 2016, Gannon followed up with Ms. Graziano, reporting pain, situational stressors, and her eviction.  (Tr. 907.)  On examination, Gannon was "somewhat on edge," but her memory was intact and her thought processes and contents were normal.  (Tr. 908.)

On February 11, 2016, Gannon presented to the emergency room for altered mental status, after neighbors had found her naked on the floor.  (Tr. 1288.)  The emergency room staff noted she smelled of alcohol and had slurred speech.  (*Id.*)  Gannon also repeatedly attempted to remove her clothing in the emergency room department.  (*Id.*)  A CT scan of her brain revealed no abnormalities.  (Tr. 1291.)  The next day, Gannon followed up with physicians' assistant Joseph Kadkick, PA-C, at Dr. Urrea's office.  (Tr. 1069.)  She denied any significant depressive

symptoms, but her memory was abnormal on examination, with poor recall. (*Id.*) Gannon's concentration, insight, and judgment were all adequate. (*Id.*) Mr. Kadkick prescribed Visteril. (*Id.*)

On February 16, 2016, Gannon underwent a psychotherapy session with Deborah Foringer. (Tr. 1067.) She reported becoming a "completely different person" since her golf cart accident, noting she had once worked as a caregiver, but now needed one herself. (*Id.*) During the session, Ms. Foringer observed Gannon had no impulse control, Gannon began to yell and pound her fist on the desk and stand up and start yelling "in the middle of a sentence." (*Id.*) Ms. Foringer recommended Gannon undergo cognitive behavioral therapy to decrease her depression and improve her impulse control. (*Id.*)

About a week later, on February 23, 2016, the EMS brought Gannon to the emergency room, after she was found on the roadside by strangers, bleeding from the back of her head. (Tr. 1284.) She was intoxicated upon arrival and the emergency room staff encouraged her to seek help for alcohol abuse. (Tr. 1284, 1287.) Upon discharge, the emergency room physicians noted Gannon was "very oriented" but "still could not recall exactly what lead up to her being found on the road." (Tr. 1287.)

On February 25, 2016, Ms. Smith at the Pennsylvania Department of Public Welfare noted Gannon had "two occurrences where she had black outs after leaving her home at night and walking out into the neighborhood" and "was found passed out on the sidewalk and in the grass and required medical attention." (Tr. 1173.) Ms. Smith recommended Gannon begin to receive 24-hour care until June 2016, at which time Gannon's needs would be re-assessed. (*Id.*)

Gannon followed up with Ms. Graziano on March 21, 2016, reporting various stressors, but improved sleep. (Tr. 1363.) On examination, Gannon's thought process and thought contents were normal, and her memory was intact. (Tr. 1364.)

A few days later, on March 23, 2016, Gannon visited the emergency room after falling down steps. (Tr. 1260.) Her neurological examination was normal. (Tr. 1262.) Her drug screen was positive for alcohol, opiates, and cocaine and her CT scan was negative for an acute intracranial hemorrhage. (Tr. 1264.)

On April 14, 2016, Ms. Graziano filled out a "Mental Residual Function Capacity Statement" prepared by Gannon's attorney. (Tr. 1366-1369.) She listed Gannon's diagnoses as organic mood disorder and cognitive disorder and noted her prognosis was "fair – current symptoms likely life-long." (Tr. 1366.) She assessed a GAF score range of 40-45. (*Id*.) With respect to Gannon's particular limitations, Ms. Graziano found the following:

- She would be precluded for 15% or more of an 8-hour workday in her abilities to:

  - understand and remember detailed instructions;
  - carry out detailed instructions;
  - maintain attention and concentration for extended periods;
  - work in coordination with or in proximity to others without being distracted by them;
  - complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods;
  - accept instructions and respond appropriately to criticism from supervisors;
  - get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
  - respond appropriately to changes in the work setting;
  - travel in unfamiliar places or use public transportation; and
  - set realistic goals or make plans independently of others.

17

- She would be precluded for 10% of an 8-hour workday in her abilities to:

  - remember locations and work-like procedures;
  - understand and remember very short and simple instructions;
  - carry out very short and simple instructions;
  - perform activities within a schedule, maintain regular attendance, and be punctual and within customary tolerances;
  - sustain an ordinary routine without special supervision;
  - make simple work-related decisions;
  - interact appropriately with the general public;
  - ask simple questions and request assistance;
  - maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness; and
  - be aware of normal hazards and take appropriate precautions.

(Tr. 1367-1368.) Ms. Graziano also opined Gannon would be "off task" more than 30% of the workday, absent from work 5 days or more per month and be unable to complete an 8-hour workday for 5 days or more per month. (Tr. 1368.) She concluded Gannon would be unable to work in a competitive setting on a full-time basis for a continuous period of 6 months or manage any benefit payments. (Tr. 1369.)

## 2. Physical Impairments

Gannon visited ear, nose, and throat specialist Edward Stafford, M.D., on February 13, 2014. (Tr. 457.) She reported ringing in her left ear, dizziness, and no sense of taste or smell since her golf cart accident. (*Id.*) On examination, her hearing testing was normal. (Tr. 460-461.) Dr. Stafford noted some debris in her ear and provided her with a topical treatment. (Tr. 461.) Gannon returned to Dr. Stafford on March 6, 2014, reporting she was no longer dizzy, but was still having ringing in her ear. (Tr. 510.) Dr. Stafford removed impacted ear wax in Gannon's left ear. (Tr. 512.)

On May 20, 2014, Gannon visited the emergency room for ankle pain after a wheelchair ran into her. (Tr. 1357.) The emergency room physicians provided her with crutches and oxycodone. (Tr. 1360.)

On January 14, 2015, Gannon consulted with pain medicine specialist Matthew LoDico, M.D., for lumbar spine. (Tr. 857.) An x-ray revealed degenerative disc disease. (*Id.*) On examination, Gannon exhibited no overt pain behaviors, but she did rise from the seated position very slowly and her gait was antalgic. (Tr. 858.) She did not heel or toe walk secondary to dizziness. (*Id.*) Her leg strength was measured at 4/5 and she had tenderness in her back. (*Id.*) Dr. LoDico ordered a lumbar MRI, an EMG, and prescribed Mobic for pain control. (*Id.*)

On February 16, 2015, Gannon consulted with orthopedist Patrick McCulloch, M.D., regarding her upper extremity numbness. (Tr. 1403.) She reported improved range of motion in her fractured right elbow, but numbness in her left hand. (*Id.*) EMGs confirmed bilateral cubital tunnel syndrome and left carpal tunnel syndrome. (Tr. 1404.) Dr. McCulloch recommended surgery and Gannon underwent a left carpal tunnel release procedure on March 3, 2015. (*Id.*)

Gannon then consulted with pain management physician Richard Plowey, M.D., on February 18, 2015. (Tr. 854.) She reported back pain radiating down her legs. (*Id.*) Dr. Plowly reviewed her lumbar MRI, which confirmed multilevel degenerative changes and varying degrees of stenosis at multiple levels. (*Id.*) On examination, Gannon rose from the seated position very slowly and had an antalgic gait. (*Id.*) She had slightly decreased strength in her legs and was tender to palpation across her back. (*Id.*) Dr. Plowey recommended Gannon undergo epidural steroid injections. (*Id.*)

On March 13, 2015, Gannon visited infectious disease specialist Philip Joson, M.D., regarding her recent labwork which confirmed a positive Hepatitis C antibody. (Tr. 877.) Dr. Joson

ordered liver function testing and an ultrasound.  (Tr. 878.)  Gannon returned to Dr. Joson on May 8, 2015.  (Tr. 873.)  Her ultrasound revealed a mild fatty liver and her liver function testing was normal.  (*Id.*)  Dr. Joson advised Gannon she was a candidate for Hepatitis C treatment and ordered additional testing.  (*Id.*)

On April 28, 2015, Gannon visited Dr. Arora for medication renewals.  (Tr. 972.)  Her physical examination was normal, beyond some wheezing.  (Tr. 974.)  Dr. Arora ordered pulmonary function testing.  (Tr. 975.)  Gannon followed up with Dr. Arora to discuss her pulmonary function testing results on May 29, 2015.  (Tr. 1232.)  Dr. Arora diagnosed her with chronic obstructive pulmonary disease ("COPD") and recommended Gannon quit smoking.  (Tr. 1230, 1232.)  Gannon indicated she was attempting to quit and reported occasionally wheezing with exertion.  (Tr. 1230.)

Gannon visited Dr. Josen on June 18, 2015 for her Hepatitis C.  (Tr. 871.)  Because Gannon's drug and alcohol screen was negative, Dr. Josen advised her after one additional test she could start Hepatitis C treatment.  (*Id.*)

On July 21, 2015, Gannon followed up with Dr. McCullough for her left arm and hand.  (Tr. 1389.)  On examination, her surgical incision had healed and Gannon denied any numbness or tingling.  (*Id.*)  Dr. McCullough measured her strength as 45 pounds bilaterally.  (*Id.*)  Gannon then underwent a right-sided carpal tunnel release.  (Tr. 1313.)  She did subsequently develop a minor infection of her surgical incision.  (*Id.*)

On August 21, 2015, Gannon had a normal physical examination with Dr. Arora.  (Tr. 965.)  Dr. Arora prescribed Gannon an inhaler for her COPD and referred her for a colonoscopy.  (*Id.*)

Gannon followed up with Dr. McCullough on February 24, 2016, indicating that while her wrists were no longer bothering her, her right elbow pain persisted.  (Tr. 1370.)  On examination,

Gannon's right arm strength was decreased and she had tenderness around the elbow. (Tr. 1371.) X-rays revealed significant osteoarthritis. (*Id.*) Dr. McCullough administered an injection, but was hesitant to recommend surgery due to the possible complications. (*Id.*) He encouraged her to seek a second opinion. (*Id.*)

Gannon then sought out a second opinion from orthopedist Christopher Schmidt, M.D., on February 25, 2015. (Tr. 1110.) On examination, Gannon had a limited range of motion in her neck and right elbow. (Tr. 1111.) Dr. Schmidt reviewed her right elbow x-rays and recommended an elbow replacement. (*Id.*) Gannon underwent this procedure on March 7, 2016. (Tr. 1014.)

Four days following her procedure, on March 11, 2016, Gannon presented to the emergency room, reporting blood at her surgical site and increasing pain. (Tr. 1272.) An ultrasound of her right arm revealed an occlusion in a central brachial vein. (Tr. 1274.) She was treated with anticoagulant medications. (Tr. 1275.)

## C. State Agency Reports

### 1. Mental Impairments

On June 3, 2014, state agency psychologist Kerry Brace, Psy.D., reviewed Gannon's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 82-83.) Dr. Brace concluded Gannon had (1) moderate restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation. (Tr. 82.) Dr. Brace also filled out a Mental Residual Functional Capacity ("RFC") Assessment, in which she concluded Gannon was markedly limited in her abilities to (1) understand and remember detailed instructions; (2) carry out detailed instructions; and (3) interact appropriately with the general public. (Tr. 86-88.) Dr. Brace

found Gannon was moderately limited in her abilities to (1) understand and remember very short and simple instructions; (2) carry out very short and simple instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or in proximity to others without being distracted by them; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (8) respond appropriately to changes in the work setting; (9) travel in unfamiliar places or use public transportation; and (10) set realistic goals or make plans independently of others.  (*Id*.)  Dr. Brace found Gannon was not significantly limited in her abilities to (1) remember locations and work-like procedures; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) make simple work-related decisions; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) ask simple questions or request assistance; and (7) be aware of normal hazards and take appropriate precautions.  (*Id*.) Dr. Brace explained the basis of her decision as follows:

> The claimant can understand and retain simple work instructions.
>
> ***
>
> The claimant is able to carry out simple work instructions and sustain an ordinary routine without special supervision.
>
> ***
>
> The claimant is able to function adequately in settings not involving much interpersonal interaction.

\*\*\*

The claimant can function in settings not involving high levels of work pressure or frequent changes in routine.

\*\*\*

The claimant is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments.

(Tr. 87-88.)

## 2. Physical Impairments

On June 13, 2014, state agency physician Gregory P. Mortimer, M.D., reviewed Gannon's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 84-86.) Dr. Mortimer determined Gannon could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 84.) He further found Gannon could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. (Tr. 84-85.) He opined Gannon could occasionally balance, stoop, kneel, crouch, and crawl and could need to avoid even moderate exposure to hazards. (Tr. 85-86.)

## D. Hearing Testimony

During the April 12, 2016 hearing, Gannon testified to the following:

- She suffered a head injury in September 2013 when she fell out of a golf cart and another golf cart ran over her head. (Tr. 41-42.) She was life flighted to a hospital for care. (*Id.*)

- She lives alone in a ground floor apartment. (Tr. 43.) She has two children. (*Id.*) She does not drive and has not driven since her accident. (Tr. 44.) She has had a case manager for several years. (*Id.*) She depends on her caregivers to take her to all of her appointments. (Tr. 55.)

- She has an 11th grade education. (Tr. 45.) Prior to her accident, she was a care giver, and would help her clients with personal hygiene and cooking. (*Id*.)

- She has poor concentration and memory and is "not the same person [she] was before this accident." (Tr. 46.) She has migraine headaches and has been receiving Botox injections for her migraines. (Tr. 48.) These injections only relieve her symptoms for 1-2 weeks. (Tr. 49.)

- She has had a "few" seizures, the most recent occurring three weeks prior. (Tr. 49.) She was taken to the emergency room for care, but does not remember the ambulance ride. (Tr. 51.) She has poor sleep and dizzy spells. (Tr. 61.) She has "passed out" about twelve times since September 2013. (Tr. 62.)

- She slipped and fell down stairs and broke her elbow. (Tr. 46-47.) She recently underwent an "elbow replacement" and continues to have trouble lifting her arm up and is in pain. (Tr. 46.)

- She has caregivers assisting her 42 hours a week. (Tr. 55.) She has one that comes in the morning, another in the evening, and her service coordinator recently requested more hours "because she feels that the care is needed for [her]." (*Id*.)

- She has arthritis "everywhere." (Tr. 63.) She also has breathing problems and uses a nebulizer. (Tr. 67.)

The VE testified Gannon had past work as a home health aide. (Tr. 69.) The ALJ then posed the following hypothetical question:

> Very well. Please consider a hypothetical individual the claimant's same age, education and work history who has the residual functional capacity to perform light[3] work as defined by the regulations with the following other

[3]     "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

limits.  This individual requires the opportunity to alternate sitting and standing every 30 minutes and occasionally climb ramps and stairs but never ladders, ropes, or scaffolds.  Can occasionally balance, stoop, kneel, crouch but never crawl.  Must avoid concentrated exposures to extremes of heat, cold, wetness, humidity and vibration, environmental irritants such as fumes, odors, dust, gases and areas of poor ventilation as well as hazards such as inherently dangerous moving machinery and unprotected heights.

(Tr. 70.)

The VE testified the hypothetical individual would not be able to perform Gannon's past work as a home health aide.  (*Id.*)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as officer helper (D.O.T. #239.567-010); information clerk (D.O.T. #237.367-018); and marker (D.O.T. #781.687-042).  (Tr. 71.)   The ALJ then inquired if an individual who was limited to "frequent handling and fingering bilaterally" would be able to perform these positions.  (*Id.*)  The VE testified a hypothetical individual would be able to perform these positions with that particular limitation.  (*Id.*)

## III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a

finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 416.971 *et seq.*).

2.    Since the alleged onset date of disability, September 14, 2013, the claimant has had the following severe impairments: traumatic brain injury; right total elbow arthroplasty; depression; and migraines (20 CFR 416.920(c)).

3.    Since the alleged onset date of disability, September 14, 2013, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that since September 14, 2013, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except that she requires the opportunity to alternate between sitting and standing every thirty minutes. The

claimant can occasionally climb ramps and stairs, but she can never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, and crouch, but she can never crawl. The claimant must avoid concentrated exposure to extreme heat, cold, wetness, humidity, vibration, as well as hazards such as inherently dangerous moving machinery and unprotected heights. The claimant is limited to frequent handling and fingering bilaterally. Finally she is limited to unskilled work, with a specific vocational preparation (SVP) of one to two, involving routine and repetitive tasks.

5.      Since September 14, 2013, the claimant has been unable to perform any past relevant work (20 CFR 416.965).

6.      Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. On November **, 2015, the claimant's age category changed to an individual of advanced age (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Prior to November **, 2015, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on November **, 2015, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Prior to November **, 2015, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 416.969 and 416.969a).

10.     Beginning on November **, 2015, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 416.960(c) and 416.966).

11.     The claimant was not disabled prior to November **, 2015, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 416.920(g)).

12.     The claimant's substance use disorder(s) is not a contributing factor material to the determination of disability (20 CFR 416.935).

(Tr. 13-26.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.      Medical Opinion Evidence

In her first assignment of error, Gannon argues the ALJ failed to properly evaluate the findings and opinions of her treating sources, Dr. Urrea and Ms. Graziano.  (Doc. No. 15 at 13.)

She "disputes the ALJ's characterization of her treatment as 'routine and conservative'" and takes issue with the ALJ's use of one treatment note and a single MMSE score when to discount the treating sources' opinions. (*Id*. at 16, 17.) Gannon argues "the ALJ's assertion that she improved in 2015 and 2016 is simply unsupported," given her increased need for in-home health services and cognitive behavioral therapy. (*Id*. at 18.) Finally, Gannon asserts the ALJ's choice to assign greater weight to the state agency physicians' opinions "is patently unreasonable, and therefore not supported by substantial evidence." (*Id*.)

The Commissioner maintains the ALJ properly considered the opinions of Dr. Urrea and Ms. Graziano. (Doc. No. 16 at 16.) She asserts the ALJ's reasons for rejecting these opinions were supported by the medical evidence of record, the selected treatment course, and Dr. Gremelspacher's April 2014 clinical findings. (*Id.* at 16, 17.) The Commissioner argues the mental status examination findings contained in the record were "largely normal." (*Id*. at 18.) She submits Gannon's "argument that the ALJ did not provide good reasons for discounting the opinions ignores the ALJ's exhaustive analysis of the record that preceded the ALJ's analysis of the opinions." (*Id*. at 20.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight." *Id.* "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'),

id. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), id. § 404.1502, 404.1527(c)(2)." *Id.* In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).[4]

As Dr. Urrea and Ms. Graziano are different types of treating sources, subject to different bodies of applicable law, the Court will consider the ALJ's treatment of these opinions separately, below.

### *Dr. Urrea*

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[5] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed,

---

[4]     SSR 96-6p was rescinded on March 27, 2017, but was in effect at the time of Gannon's administrative hearing. *See* SSR 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

[5]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

"[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits

---

[6]     Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.

Because of the significance of this requirement, the Sixth Circuit has held that the failure to

articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of

substantial evidence, even where the conclusion of the ALJ may be justified based upon the

record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical

data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581

F.3d at 406.  Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the

treating physician instead submits an opinion on an issue reserved to the Commissioner—such

as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of

vocational factors— [the ALJ] decision need only 'explain the consideration given to the

treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec*., 535 Fed. App'x 498, 505 (6th

Cir. 2013).  The opinion, however, "is not entitled to any particular weight." *Turner*, 381 Fed.

App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir.

2014).

Moreover, an ALJ must consider the findings and opinions of the state agency

medical consultants, because the "Federal or State agency medical or psychological

consultants are highly qualified and experts in Social Security disability evaluation." 20

C.F.R. §404.1513a(b)(1).  When doing so, an ALJ will evaluate the findings using the relevant

factors in §§ 404.1520b, 404.1520c and 404.1527, such as the consultant's medical specialty

and expertise, the supporting evidence in the case record, consistency of the consultant's

opinion with evidence from other sources in the record, supporting explanations the medical or

psychological consultant provides, and any other factors relevant to the weighing of the

opinions. 20 C.F.R. § 404.1513a(b)(2). Finally, an ALJ must explain in the decision the

weight given to the opinions of a State agency medical or psychological consultant unless a

treating physician's opinion has been accorded controlling weight. *See* 20 C.F.R §

404.1527(e).

> The ALJ weighed the opinion evidence from Dr. Urrea and Ms. Graziano as follows:

> In contrast, the undersigned accords little weight to the medical source statements provided by Shelley L. Roisen,[7] Ph.D., Dr. Urrea, and NP Graziano in August 2014, September 2014, and April 2016 respectively. Dr. Roisen, Dr. Urrea, and NP Graziano each opined that the claimant had significant limitations in cognitive and social functioning that left her unable to perform any work on a regular and continuous basis. Dr. Roisen further provided the claimant had a current GAF score of 48 and NP Graziano provided the claimant had a current GAF score of 40-45, with GAF scores in the 40's indicative of extreme symptoms and functional limitations. (*See* Exhibits 26F; 28F, 51F).

> While Dr. Roisen, Dr. Urrea, and NP Graziano are treating sources, their opinions are not supported by or consistent with the relatively routine and conservative mental health treatment the claimant received. Their opinions are also inconsistent with Dr. Gremelspacher's clinical findings from April 1, 2014, as well as the claimant's reports of symptom improvement in her psychological symptoms and the relatively normal mental status examination findings of record from 2015 and 2016, as described above. For these reasons, the undersigned accords little weight to the medical source statements provided by Dr. Roisen, Dr. Urrea, and NP Graziano.

---

[7]     As correctly noted by Gannon, Dr. Roisen is not her treating source. (*See* Doc. No. 15 at 15.) Rather, it appears Dr. Roisen treated another individual, unrelated to Gannon or her claim for benefits. (*See* Tr. 680-683.) Despite Gannon noting this in her Brief, the Commissioner compounded the ALJ's oversight by not only including Dr. Roisen's opinion in the transcript of this matter, but also including it in her discussion of the evidence. (*See* Doc. No. 16 at 8.) The Court finds this incredibly concerning, as the private medical record of an unrelated individual, unbeknownst to that individual, is now part of the record in this case.

(Tr. 23.)

The Court finds the ALJ failed to properly evaluate Dr. Urrea's opinion. As noted above, an ALJ must provide "good reasons" for the weight assigned to treating source opinions, and articulate those reasons in order to allow for meaningful appellate review. Here, while the ALJ did provide reasons for discounting Dr. Urrea's opinion, they are not supported by substantial evidence.

In particular, the ALJ discounted Dr. Urrea's opinion on the basis it was "not supported by or consistent with the relatively routine and conservative mental health treatment" Gannon received. (Tr. 23.) As an initial matter, the ALJ fails to cite or direct the reader to the specific types of treatment he used to support his reasoning. Moreover, the Court does not agree with the ALJ's or the Commissioner's characterization of Gannon's treatment as "relatively routine and conservative." Indeed, since her September 2013 accident, Gannon has regularly treated with a neurologist, a psychologist, a psychiatrist, and a psychiatric nurse practitioner. (Tr. 413, 525, 687, 924.) She has consulted with a neurosurgeon and a concussion specialist. (Tr. 658, 425.) She has a patient advocate, a case manager, and a guardian. (Tr. 424, 684, 688.) Gannon also has had two emergency room visits for altered mental status – one after which she was found bleeding on the side of a road and another where she was found naked on the floor. (Tr. 1288, 1284.)

Moreover, Gannon requires an in-home caregiver, a service which is hardly "routine and conservative." (Tr. 1067.) In December 2014, the Pennsylvania Department of Public Welfare determined Gannon required a personal assistant services worker "with her in the morning and throughout the day as well as the evening to ensure she is eating and taking her

medications as prescribed." (Tr. 1172.) By September 2015, the Pennsylvania Department of Public Welfare authorized Gannon to receive personal assistant services for 42 hours a week. (Tr. 1150.) She was noted to be "a severe fall risk" with a "high level of anxiety" and "extremely nervous." (*Id*.) In December 2015, it was recommended Gannon receive additional hours of assistance, as the behavioral changes from her head trauma had increased, including "aggression, memory loss, anxiety, agitation, and depression." (Tr. 1165.)

 The ALJ did acknowledge Gannon received in-home services in the decision, but reasoned "she otherwise lives independently, which indicates she is capable of performing a number of daily activities independently." (Tr. 15.) Similarly, the Commissioner[8] discounts the need for these services, characterizing them as "transportation services and Christmas decorating." (Doc. No. 16 at 25.) However, the form authorizing these services listed Gannon's needs as assistance with bathing, hair care, dressing, meal preparation, eating, laundry, light housekeeping, shopping, medication management, reading, managing finances, securing transportation, appointment scheduling, and supervised walks. (Tr. 1151.) The Pennsylvania Department of Public Welfare has also observed Gannon required "a great deal of support." (Tr. 1165.) Moreover, in February 2016, after her two emergency room visits, the Pennsylvania Department of Public Welfare recommended Gannon begin to receive 24-hour care. (Tr. 1173.) Based upon this evidence, it is unclear why the ALJ felt Gannon "otherwise lives independently." (Tr. 15.)

---

[8] The Court notes the Commissioner, in her Brief, asserts these services were necessary due to Gannon's physical, not mental, impairments. (Doc. No. 16 at 23.) However, the evidence clearly indicates Gannon required assistance not only due to her physical problems, but her anxiety, depression, memory loss, and agitation as well. (Tr. 1150, 1165.)

The ALJ also discounted Dr. Urrea's opinion on the basis of an April 1, 2014 treatment note and "relatively normal mental status examination findings from 2015 and 2016." (Tr. 23.) On April 1, 2014, Gannon underwent a psycho-social assessment with Dr. Gremelspacher and received a score of 26/30 on the MMSE, indicating a "minor disruption." (Tr. 527.) However, Dr. Gremelspacher also observed Gannon was somewhat unkempt, was complaining loudly in the waiting room, sighed excessively during testing, and displayed tangential thought content. (*Id.*) Furthermore, Gannon underwent several other MMSEs during the relevant period, all in which she scored much lower than 26/30 and displayed deficits across all areas. (Tr. 690, 686, 1091.)

The ALJ discounted these low MMSE scores by asserting they were "inconsistent with the largely normal mental status examination findings" in the treatment notes. (Tr. 19.) He again references these "normal mental status examination findings" when assigning Dr. Urrea's opinion little weight. (Tr. 23.) As an initial matter, the ALJ does not cite or direct the reader to the specific treatment notes and examination findings he uses to support his reasoning. Moreover, while Gannon's various treatment providers may have noted intact memory, insight, and judgment, they also noted Gannon had "a major cognitive impairment due to trauma," tangential discourse, would repeat stories, presented as hysterical and in a disorganized fashion, displayed poor insight, a blunted tone, rapid speech, had persistent poor sleep, and required frequent redirection. (Tr. 687, 688, 686, 916, 1091, 684, 1087, 1086, 1082, 1080, 924, 1076, 915.) Specifically, in February 2015, Gannon was fidgety, displayed inappropriate laughter, and "tried to play peek a boo" when she arrived for her appointment with Dr. Gremelspacher. (Tr. 1078.) Also, during a February 2016 psychotherapy session,

Gannon was yelling and pounding her fist on a desk, and standing up and yelling "in the middle of a sentence." (Tr. 1067.)

The ALJ does not sufficiently explain how, in light of the above evidence, citing one treatment note from April 2014 and referencing several normal mental status examinations supports affording Dr. Urrea's opinion "little weight." While the ALJ is not expected to discuss or cite to every MMSE or treatment note, it is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding." *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 (N.D. Ohio March 11, 2013). *See also Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014)(stating that it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.).

The Court also notes the Commissioner attempts to discredit the portions of Dr. Urrea's opinion pertaining to off-task behavior and absences. (Doc. No. 16 at 19.) Specifically, she asserts since these restrictions were based on Gannon's physical condition, and Dr. Urrea did not treat Gannon's physical condition, this portion of the opinion was "not within [his] medical specialty and based on medical evidence." (*Id.*) As an initial matter, the ALJ did not discuss these specific restrictions in his analysis of the opinions. As such, the Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ. *See Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013) ("arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by

an administrative agency rather than counsel's 'post hoc rationale' that is under the Court's consideration."). Moreover, the Commissioner's argument is disingenuous at best. While Dr. Urrea did opine Gannon would be off-task more than 30% of the workday and would likely be absent from work three days a month, he did not base this portion of his opinion upon Gannon's physical condition. (Tr. 699.) Rather, he filled out a form which instructed him to consider Gannon's "physical and mental limitations" in combination and estimate the number of absences due to Gannon's "physical and/or mental impairment." (*Id.*)

Finally, the Court questions why the ALJ, rather than providing a separate analysis for Dr. Urrea's opinion, considers it in conjunction with an opinion unrelated to Gannon. As discussed *supra*, there is no record of a "Dr. Roisen" treating Gannon, and more telling, her medical source statement references a completely different individual, with a different birth date and social security number. (*See* Tr. 680-683.) The Court is concerned if the ALJ gave full and thoughtful consideration to the opinion of Dr. Urrea, as his opinion received the same exact treatment as a physician unrelated to Gannon.

In sum, the ALJ's decision fails to set forth good reasons for discounting the opinion of Dr. Urrea. Accordingly, the Court finds a remand is necessary, thereby affording the ALJ the opportunity to sufficiently address the limitations assessed by Dr. Urrea.

### Nurse Practitioner Graziano

Under Social Security Regulations, a nurse practitioner is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys. *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f).[9] However, the regulations

---

[9]     For claims filed prior to March 27, 2017. *See* 20 C.F.R. §§ 416.902(a)(7).

also provide these opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c). The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03[10] further explains how opinion evidence from "other sources" should be treated. SSR 06-03p provides information from "other sources" (such as a chiropractor) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006). Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also Williams v. Colvin,* 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017).

As noted *supra*, the ALJ considered and weighed the opinion of Ms. Graziano in conjunction with Dr. Urrea's opinion, providing the same exact reasons for discounting it.

---

[10]     The Court notes SSR 06-03p was rescinded on March 27, 2017. This rescission is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1.

The Court acknowledges Ms. Graziano, as a non-acceptable medical source, is not entitled to the same deference afforded to Dr. Urrea. However, because the Court has several concerns regarding the reasoning provided by the ALJ, as detailed above, the ALJ should, upon remand, more carefully consider the opinion of Ms. Graziano.

***State Agency Psychological Consultant***

The ALJ weighed the opinion of the state agency psychological consultant as follows:

The undersigned accords great weight to the June 2014 opinion provided by Disability Determination Services psychological consultant Kerry Brace, Psy.D. Dr. Brace opined that the claimant had moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace, but no episodes of decompensation. (*See* Exhibit A1 at 8-9). Dr. Brace opined that the claimant could understand, remember, and carry out simple work instructions and sustain an ordinary routine without special supervision, could function adequately in settings not involving too much interpersonal interaction and could function in settings no involving high levels of work pressure or frequent changes in routine. (*See* Exhibit 1A at 12-14).

While Dr. Brace is not a treating or examining source, she is particularly familiar with our disability programs and their requirements. Dr. Brace demonstrated that she thoroughly considered the available medical evidence in forming her opinion, and her conclusions are consistent with and supported by Dr. Gremelspacher's clinical findings from April 1, 2014. Dr. Brace's conclusions are also largely supported by and consistent with Dr. Gremelspacher and NP Graziano's treatment notes from 2015 and 2016, which show that the claimant reported improvement in her symptoms and appeared largely normal on mental status examinations. For these reasons, the undersigned accords Dr. Brace's opinion great weight.

(Tr. 22-23.)

Gannon argues the ALJ's "decision to rely on a non-examining source who reviewed only a fraction of the evidence over the consistent opinions of Plaintiff's treating providers is patently unreasonable." (Doc. No. 15 at 18.) She notes Dr. Brace "did not review nearly

1,000 pages of treatment notes that were entered into the record after his review," including the treating source opinions and documented need for in-home health services. (*Id.*)

The Court notes that, regardless of Gannon's arguments, the ALJ is charged with considering the findings and opinions of the state agency medical consultants, because the "Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. §404.1513a(b)(1). Nonetheless, the Court declines to evaluate the ALJ's weighing of the state agency opinions, as the ALJ's of Dr. Urrea's opinion on remand may alter his evaluation[11] of the state agency physician's conclusions.

In sum, the Court finds this matter should be remanded, thereby affording the ALJ the opportunity to sufficiently address the limitations assessed by Dr. Urrea. Further, on remand, the Court directs the Commissioner to remove Dr. Roisen's medical source statement from the record and ensure only medical evidence pertaining to Gannon is contained within the record.

Finally, as this matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Gannon's remaining[12] assignment of error.

---

[11]     The Court does find it curious while the ALJ assigned Dr. Brace's opinion "great weight," he did not incorporate the bulk of her findings or limitations in the RFC. Indeed, Dr. Brace found Gannon was markedly limited in her ability to interact with the public and could not function in settings involving high levels of work pressure. (*See* Tr. 87-88.) By contrast, the only mental limitation in the RFC is a limitation to unskilled work, involving routine and repetitive tasks. (Tr. 16.)

[12]      Gannon's second assignment of error relates to her need for in-home health services. As detailed above, the Court has concerns regarding the ALJ's evaluation of Gannon's in-home health services. On remand, the ALJ should carefully consider Gannon's use of in-home health services when evaluating Dr. Urrea's opinion.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and the

matter is REMANDED for further proceedings consistent with this decision.

**IT IS SO ORDERED.**


    _s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 5, 2018